In the Matter of the Estate of JOHN J. VAN NOSTRAND, Deceased.

Surrogate's Court, Kings County, July 30, 1941.

*Spencer, Ordway & Wierum* [*Otto C. Wierum* and *George J. Schaefer* of counsel], for the trustee, petitioner.

*Stewart & Shearer* [*Williamson Pell, Jr.,* and *Robert A. West* of counsel], for Le Baron S. Willard, Jr., as administrator *d. b. n.* of Gardiner Van Nostrand and persons claiming through the estate of Gardiner Van Nostrand.

*Sullivan & Cromwell* [*William C. Pierce* of counsel], for William Nelson Cromwell, Robert Morgan King and Alfred Jaretzki, Jr., as executors under the will of Louisa B. Van Nostrand, distributee.

*Davies, Auerbach, Cornell & Hardy,* for the Irving Trust Company, as successor trustee under the will of Anna Bell Van Nostrand.

*Thomas E. White,* for the Fidelity and Deposit Company of Maryland, surety on the bond of Elizabeth M. Butler, trustee.

WINGATE, S. John J. Van Nostrand died, a resident of Kings county, on January 7, 1889. His will was admitted to probate in this court on the twenty-fourth of the same month. He was survived by his widow, Nancy, by three children, Gardiner, Sarah and Fanny, and by a grandson, John, the issue of a predeceased son, as his only heirs at law and next of kin.

The directions of this will with the exception of the residuary clause are preponderantly immaterial at the present time. Suffice it to note that it contained numerous general bequests and made provision for the life of the widow, the directions in this regard being subject to the express stipulation that they should be in lieu of dower and of any distributive share in the estate. Since she accepted and enjoyed the gifts thus made without demur, all interest in her for present purposes is absent.

The presently controverted direction is contained in the item of the will numbered "11." This reads: "All the rest of my estate, I give, devise and bequeath to my executors in trust to collect the rents and income and apply the same to the use of my children during their natural lives and after their decease to their children, the part the deceased parent would be entitled to under the Laws of the State of New York."

The named executors were the widow, the son and the two daughters. All qualified as executors and all except the widow, who survived the testator by only a year, acted as trustees.

Pursuant to the residuary clause, as construed by Mr. Justice (subsequently Chief Judge) CULLEN, separate trusts were erected for the children of the testator and for the grandson. That presently in question is the one erected for the benefit of Fanny, who was the last to die and whose death occurred on November 11, 1939.

The first question which is in issue in the present proceeding relates to the manner of devolution of the remainder of this trust by reason of the fact that she left no children surviving.

Litigation respecting the meaning of this will is not a novel experience. It has been submitted to adjudication on five previous occasions, namely by Mr. Justice (subsequently Chief Judge) CULLEN in 1889; by the Appellate Division for the Second Department in 1897; by Mr. Justice MORSCHAUSER, in the Supreme Court, Orange county, on May 14, 1907; by this court in an unreported opinion appearing in the New York Law Journal on June 15, 1940 (p. 2728), and by Mr. Justice DODD in November, 1940. It is asserted by certain parties that some of these pronouncements have rendered *res adjudicata* the present issue of its correct devolutionary effect. Whereas the court is inclined to accept this view, it prefers

to decide the issue *de novo* rather than to permit itself to become involved in the subtleties of the several refinements of the doctrines of *res adjudicata* and *stare decisis* which have been urged in support of this view.

The reason for the present issue is that Fanny had a son who predeceased her without issue  It is accordingly insisted by certain parties that the remainder gift " to their children," namely, those of the primary *cestuis que trustent* vested indefeasibly in him at birth and that in consequence, despite his predecease of the life beneficiary, his estate is entitled to receive the remainder.

As indicated in its previous memorandum on the subject, the court is wholly unsympathetic with this view and prefers to align itself with the various distinguished jurists including the unanimous bench of the Appellate Division for this department who have held to the contrary.  The remainder gift is to " children " of the equitable life tenant, which is with substantial uniformity determined to effect a gift to a class (*Matter of King*, 200 N. Y. 189, 193; *Matter of Kimberly*, 150 id. 90, 93; *Matter of Doherty*, 227 App. Div. 265, 267; *Matter of Lyons*, 154 Misc. 368, 371; affd., 271 N. Y. 204; *Matter of Weil*, 151 Misc. 841, 850; affd., 245 App. Div. 822; affd., 271 N. Y. 608; *Matter of Agrella*, 175 Misc. 456, 458), entitling those only to participate who are living when the time for beneficial enjoyment shall have arrived.  (*Teed* v. *Morton*, 60 N. Y. 502, 506; *Delaney* v. *McCormack*, 88 id. 174, 183; *Bisson* v. *West Shore R. R. Co.*, 143 id. 125, 131; *Matter of Allen*, 151 id. 243, 247; *Matter of Leonard*, 218 id. 513, 521; *Matter of Koch*, 282 id. 462, 465.  See, also, Butler, N. Y. Surrogate Law & Practice, §§ 2020, 2022.)  The court accordingly again decides that the gift of the remainder of this trust was solely to those persons, if any, who might be living at the death of the life beneficiary and answer to the description of her " children."

Since no one was then in existence who could qualify as corresponding to this appellation, and since the gift in question was made in the residuary item of the will, it follows that no valid gift of the remainder was made and that it must devolve as intestate property. (*Morton* v. *Woodbury*, 153 N. Y. 243, 256; *Wright* v. *Wright*, 225 id. 329, 340, 341; *Cochrane* v. *Schell*, 140 id. 516, 537.)

It follows that the distribution must be made to the statutory distributees of the testator as they existed at the time of his death, with the exception of the widow who was expressly barred from any participation beyond her directed share by the condition imposed by the testator on her gift  As hereinbefore noted, eliminating her, these intestate participants were the son, the two

daughters and the grandson of the deceased, each of whom, as a *prima facie* matter, became entitled to *pro rata* participation.

At this point, however, another consideration intrudes itself for the development of which certain additional facts become necessary of recital. It has been noted that testator's son Gardiner qualified and acted as a trustee up to the time of his death which occurred on January 1, 1894, on which date he committed suicide. Following his demise, it was found that he had embezzled funds of the estate aggregating $219,506.85 in amount. This was determined in a proceeding for a construction of the will and an accounting instituted in the Supreme Court for Orange county by the surviving trustees. The findings in that action, in addition to construing the will in the manner readopted by the court in the present proceeding, established that at and prior to his death Gardiner was the sole active trustee of the trust, had all of its securities in his possession, that the surviving trustees were entitled to receive in kind all those which were still on hand and capable of identification, and that there was a deficiency in value to the extent indicated.

At the time of the settlement of Gardiner's estate, this deficiency, then aggregating $228,241.50, was presented as a claim before the surrogate and was accorded a *pro rata* distribution amounting to $28,215 86. In other words, Gardiner. by reason of his embezzlement of the assets of the estate, is still morally indebted to it in the total of $200,025.64, with interest from February 21, 1895. Despite this fact, those representing Gardiner's interest contend that they are entitled to the intestate share of this remainder which would otherwise have been awardable to him.

As a matter of first impression, the position that a defaulting and embezzling fiduciary, or those claiming through him, may receive a distribution of assets of an estate which he has so grievously wronged and to which there has been a minimum of restitution appears fundamentally opposed to the most primary principles of equity.

The syllogism upon which the argument is predicated is that the indebtedness of Gardiner to the estate was voluntarily reduced to judgment in the Supreme Court action in 1895 and that since more than twenty years have expired since its entry, this judgment is conclusively presumed to have been paid although the fact is admittedly to the contrary.

In evaluating this contention, it may be noted at the outset that the relevant documents appended to the stipulation of facts do not bear out the description which is advanced as a premise

for the syllogism. Truly, an action was instituted by the surviving trustees, but this was neither against the defaulting fiduciary nor to recover a sum of money from him. Its purpose was merely to compel an accounting by his administratrix for his acts and to secure possession of the tangible assets of the estate over which he, in his lifetime, had exercised sole fiduciary dominion and which, presumably, had passed into the custody of this administratrix. No judgment was or could have been awarded against Gardiner since, except in extremely unusual circumstances not here relevant, no judgment may ever be entered against a dead man.

The sole effects of the judgment were to construe the will, and to determine, *first*, that the surviving trustees should receive in specie the securities of the estate which were still traceable; *second*, that the dead man, who was not a party to the action, had misappropriated a certain sum; and, *third*, that the surviving trustees had a *prima facie* claim against the assets in the hands of the administratrix in an amount equivalent to the assets of the trust which had been in the hands of the embezzler and had not been found. Since the administratrix of his estate was not liable for any assets which had not come into her individual possession, it is obvious that the purpose of the action was not a determination *in personam* against any one but merely one *in rem*, and satisfaction of such a judgment may not be presumed merely by reason of a lapse of time following its entry.

As a matter of law the entry of any judgment in an action against an estate fiduciary as such does not establish anything conclusive. Its effect, so far as the assets of the estate in his charge are concerned, is merely to establish as a *prima facie* matter that a debt in the amount determined existed against the decedent at the time of his death. (*Matter of Warrin,* 56 App. Div. 414, 416.) The subsequent status of the obligation is in all particulars equivalent to the position attained by a claim by mere allowance by the estate fiduciary. (Butler. N. Y. Surrogate Law & Practice, § 1636.) It is not enforcible as a matter of right by ordinary process (Dec. Est. Law, § 151) and the fiduciary may not be examined in supplementary proceedings in respect of it. (*Jones* v. *Arkenburgh,* 112 App. Div. 483, 485; *Matter of Cohen,* 173 Misc. 835, 837; *Dander Corp.* v. *Connor,* 169 id. 686.) The only effect of the determination, even if it is subsequently sustained in the Surrogate's Court, is to transform an unestablished claim into a proved debt which is entitled to payment, if at all, only subsequent to the satisfaction of administration and funeral expenses and any other debts accorded priority in payment pursuant to the provisions of section 212 of the Surrogate's Court Act.

Even if the determination survives all of these hazards, however, its payment is conditioned on the presence of remaining assets in the estate which are adequate in amount to satisfy it and all other debts which are entitled to parity of treatment. It follows, therefore, that the mere recovery of a judgment upon a claim against the estate of a decedent carries with it no inference or presumption that it will ever be paid either in full or in part. It is accordingly not a judgment in the ordinary connotation of the term (See *Van Rensselaer* v. *Wright*, 121 N. Y. 626, 629; *Wing* v. *de la Rionda*, 125 id. 678, 680), but merely a *prima facie* establishment of the existence of a valid indebtedness. This indebtedness, furthermore, is not established as an obligation of the decedent, since he is no longer in existence, but merely *in rem* against the assets in the hands of the fiduciary whose office it is to distribute the property which he has reduced to possession among those legally entitled thereto.

For present purposes it appears patent, therefore, that this so-called judgment is not of the variety which the Legislature contemplated when it enacted section 44 of the Civil Practice Act, and the terms of that statute may not be deemed applicable thereto. All which was established thereby was that Gardiner at the time of his death was *prima facie* indebted to the trust in the specified amount, and that the latter was entitled to participate in the distribution of the assets in the hands of the fiduciary to the extent permitted by the relevant statutes.

It is a fundamental equitable principle of surrogate law that no beneficiary may claim any distributive rights from an estate until he has satisfied all of his obligations to it. (*Smith* v. *Kearney*, 2 Barb. Ch. 533, 547–549; *Clapp* v. *Meserole*, 1 Abb. Dec. 362, 365; *Stagg* v. *Beekman*, 2 Edw. Ch. 89, 92; *Ferris* v. *Burrows*, 34 Hun, 104, 107; *Matter of Bogart*, 28 id. 466, 468; *Matter of Flint*, 120 Misc. 230, 232; affd., 206 App. Div. 778; *Matter of King*, 174 Misc. 937, 938; *Matter of Singer*, 171 id 509, 511; *Matter of Cramer*, 166 id. 713, 714; *Matter of Hahn*, 163 id. 70; *Matter of Sawin*, 173 id. 428, 432.) This would here be applicable to defeat the assertion of any distributive rights by Gardiner even if he had been merely an ordinary distributee, since the obligation thus *prima facie* established was not independent indebtedness to the testator, but a new and direct liability to the quasi entity of the trust. (*Matter of Grifenhagen*, 168 Misc. 568, 570; Restatement of the Law of Trusts, §§ 251, 257.)

In the present instance the rule which prevents an embezzling fiduciary from participating in any benefits from the trust which

he has wronged until after he has completely repaired his defalcations is rooted in even more fundamental conceptions of public policy. As noted by the court in *Matter of Dacre [Whitaker v. Dacre]* (1 Ch. Div. [1916] 344, 347): "The theory on which that rule is based is that the Court treats the trustee as having received his share by anticipation, and the answer to any claim made by the trustee is this; 'You have already received your share; you have it in your own hands.'" This rule is restated with approval by Professor Scott (2 Scott on Trusts, § 257): "It seems clearly just that the trustee who by a breach of trust has caused a loss to the trust estate should make good the loss out of his share. It is sometimes said that he must be regarded as having received his share in whole or in part by anticipation. This, however, is rather a fictitious way of putting it. It is accurate enough if the trustee has in fact misappropriated a part of the trust property; but where he has merely caused a loss to the trust estate without receiving any benefit, it can hardly be said that he has received his share. The principle, however, is equally applicable in the latter case * * *."

In the present instance the trustee was guilty of actual embezzlement, wherefore no fiction is present in the application of the rule. The court accordingly determines that immediately upon the making of the defalcations an equitable lien was impressed upon any rights or interests which Gardiner possessed in the estate and that these were in effect forthwith appropriated by equity for the purpose of accomplishing partial restitution of his misappropriations.

It follows that the share to which Gardiner Van Nostrand would otherwise have been entitled is deemed to have vested in the other distributees for the purpose of *pro tanto* reparation of his defalcations and that those claiming through him possess no interest in the present distribution. Since by reason of this fact these parties possess no interest in the subject-matter of this proceeding, their answer and objections must be dismissed.

There accordingly remain for consideration only the objections interposed on behalf of those deriving their interest under John J. Van Nostrand, the grandson, whose father predeceased the testator. These are addressed solely to the manner of conduct of the salvage operation in respect of the premises 324–326 East Sixty-second street, New York city.

They are two in number, namely, the first, predicated on the alleged negligent loss occasioned by the trustees in permitting the accumulation of taxes in the aggregate amount of $6,961.56 before taking steps to protect the investment; and the second, to the

payment of income to the life beneficiary on the property in process of salvage prior to the repayment of new money invested in the operation.

Respecting the former, the record demonstration is meagre indeed. Apparently the trustees made no investigation respecting the payment of taxes until some time after the mortgagor had defaulted in the payment of interest on the mortgage. Obviously, such inaction did not constitute that diligence and prudence which the hypothetical individual of intelligence in such matters would be presumed to display and consequently constituted a dereliction in the performance of the duties of trustee. The question thereupon arises as to the extent of the loss occasioned thereby. There is no inference that discovery would have resulted in saving the amount of the unpaid taxes to the estate nor that it would have been the part of wisdom to institute foreclosure proceedings at once by reason of the default. Indeed the court is not clear from the statements of the account as to the period during which the taxes went unpaid.

With this absence of concrete demonstration the only available course appears to be to fall back on general principles. The taxes were a primary charge upon the property and should not have been permitted to become a prior lien on the remainder interest while at the same time the life beneficiary was receiving income which should have been applied for this purpose. The court accordingly determines that in so far as the life beneficiary received interest on the mortgage at a time when taxes were in arrears, such payment to her was improper and constituted a diversion of the trust assets and that the trustees in office at the time must be surcharged with such payments. They will, however, be permitted to recoup such surcharge from the interest of the life beneficiary in the remainder. Correspondingly, the sums recouped will effect a *pro tanto* reduction of the principal expenditures in connection with the salvage operation and a *pro tanto* increase of the interest of the life beneficiary in the ultimate proceeds of that operation.

The parties can, no doubt, readily agree upon the concrete figures applicable for the working out of this formula.

The second objection raises the issue as to propriety of payment to the life beneficiary of the net rentals of the property in process of salvage for the years 1937 to 1939, inclusive, despite the fact that the principal advances had not been repaid. This has been done in purported reliance upon section 17-c of the Personal Property Law. This enactment, however, took effect only on

April 13, 1940. Prior to that time, the rule was established that no income was permissible of payment to the income beneficiary until all principal advances had been repaid. (*Matter of Otis*, 277 N. Y. 650; *Matter of Brainerd*, 169 Misc. 640, 642; *Matter of Pelcyger*, 157 id. 913, 941, 942; *Matter of Martin*, 165 id. 597, 612; *Matter of Eggers*, 167 id. 66; *Matter of Hamburger*, 171 id. 896, 897.) Accordingly, at the time the income here in question was received, the law was clearly established that it was usable only for the repayment of principal advances and by application of the principle that equity deems that done which should have been done, it must be deemed so to have been applied. It may, accordingly, not be taken from the principal of the operation and allocated to the income beneficiary  In this respect, at least, the statute may not be accorded a retroactive operation.

It follows that the second objection, addressed to the allocation of the income of the salvage operation, must be sustained. If the income has actually been paid, the trustees will be surcharged in that amount but may again recoup from the interest of the life beneficiary in the remainder. The income thus withdrawn will be applied in reduction of the capital advances instead of application against the ultimate share of the life beneficiary in the salvage proceeds upon the termination of the operation.

The court is in substantial agreement with the unreported decision of Surrogate Foley (*Matter of Parker*, N. Y. L. J. Feb. 14, 1941, p. 696) respecting payment of current income received after the death of the life beneficiary to the remaindermen. This may safely be done, since the accretion to the ultimate credit of the life beneficiary has now come to an end. It is to be recalled, however, that " all income received from the operation of real property in process of salvage is deemed a part of the receipts of the salvage operation as a whole, and must be apportioned between income and principal to the same extent, and in like manner as the net sales proceeds when the transaction has been entirely completed and the securing realty which has been taken over for purposes of salvaging the mortgage investment, is sold." (Butler, N. Y. Surrogate Law & Practice, § 2537; *Matter of Chapal*, 269 N. Y. 464, 472; *Matter of Otis*, 276 id. 101, 111; *Matter of Brainerd*, 169 Misc. 640, 644.) It follows, therefore, that whereas subsequent net income is permissible of current payment, it must be taken into account on the final liquidation of the salvaged property, both as a receipt of the operation and as a *pro tanto* payment upon the ultimately determined interest of the remaindermen in the operation. In other words, it must be included in the total indicated in " B "

in the formula of apportionment contained in section 2543 of Butler on New York Surrogate Law and Practice and subtracted from the result of the first equation therein set forth.

Enter decree on notice in conformity herewith. ·